1    TODD A. ROBERTS (SBN 129722)
     JESSHILL E. LOVE (SBN 208348)
2    ROPERS, MAJESKI, KOHN & BENTLEY
     1001 Marshall Street, Suite 300
3    Redwood City, CA  94063-2052
     Telephone:    (650) 364-8200
4    Facsimile:    (650) 780-1701

5    Attorneys for Plaintiffs
     THOMAS CIRRITO, AN INDIVIDUAL; AND
6    ATOCHA LAND, LLC, A DELAWARE LIMITED
     LIABILITY COMPANY
7

8                        UNITED STATES DISTRICT COURT

9                       NORTHERN DISTRICT OF CALIFORNIA

10                            SAN JOSE DIVISION

11

12   THOMAS CIRRITO, an individual; and          CASE NO.   C08   03477   PVT
     ATOCHA LAND, LLC, a Delaware
13   limited liability company,                  COMPLAINT FOR:

14                   Plaintiffs,                  (1)   VIOLATION OF SECTION 10B AND
                                                  RULE 10B-5 OF THE SECURITIES
15   v.                                           EXCHANGE ACT OF 1934;
                                                  (2)   RESCISSION OF SECURITY
16   RNC HOLDINGS, LLC, a Nevada limited          TRANSACTION PURSUANT TO CORP.
     liability company; RONALD                    CODE SECTIONS 25501 AND 25401;
17   BUCHHOLZ, an individual; CHARICE             (3)   RESCISSION OF SALE OF
     FISCHER (also known as CHARICE               SECURITIES NOT QUALIFIED FOR
18   BUCHHOLZ), an individual; and DOES 1         SALE AND RESTITUTION PURSUANT
     through 50, inclusive,                       TO CALIFORNIA CORP. CODE
19                                                SECTIONS 25503, 25102, 25110;
                     Defendants.                  (4)   BREACH OF FIDUCIARY DUTY.
20

21                                               JURY TRIAL DEMANDED

22        PLAINTIFFS THOMAS CIRRITO, an individual, and ATOCHA LAND, LLC, a

23   Delaware limited liability company ("Plaintiffs") submit their Complaint against DEFENDANTS

24   RNC HOLDINGS, LLC, a Nevada limited liability company, RONALD BUCHHOLZ, an

25   individual, CHARICE FISCHER (also known as CHARICE BUCHHOLZ), an individual, and

26   DOES 1 through 50 ("Defendants"), as follows.

27

28

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

RCI/5146233.1/BRL                        - 1 -                              COMPLAINT

# I.

## INTRODUCTION AND OVERVIEW OF THE ACTION

1.    This is an unlimited civil action brought on the following bases:  Violation of Section 10b and Rule 10b-5 of the Securities Exchange Act of 1934; Violations of California Corporations Code §§ 25401, 25501, 25503, 25110, 25130; and Breach of Fiduciary Duty.

2.    On information and belief, Plaintiffs allege that Defendants created a real estate investment scheme to defraud Plaintiffs of $2,600,000.00 of invested securities.  Defendants engaged in a scheme to secure investment funds from Plaintiffs and take nearly $1,000,000 in fees up front, resulting in an undercapitalization of the project to the point that it was unsaleable. In order to obtain the funds, Defendants promised Plaintiffs, both orally and in writing, a return on investment greater than 50%.

3.    By this complaint, Plaintiffs seek damages in an amount to be proven at trial, as well as rescission of the unqualified securities.

# II.

## JURISDICTION AND VENUE

4.    This is an action for rescission and damages arising out of Defendants' violations of Section 10b and Rule 10b-5 of the Securities Exchange Act of 1934; California Corporations Code §§ 25401, 25501, 25503, 25110, and 25130; and Breach of Fiduciary Duty.

5.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, federal question jurisdiction, based on the Rule 10b-5 claim in this action.  This Court has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367 because the remaining state law claims are so related to the Rule 10b-5 claim that they form a part of the same case or controversy and fall within this Court's supplemental jurisdiction.

6.    In addition, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2), diversity of citizenship jurisdiction, because all Plaintiffs are citizens of different states than all Defendants, and because the amount in controversy exceeds $75,000.00.

7.    Venue is proper in the Northern District of California pursuant to 28 U.S.C.

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1   § 1965(a) because the Defendants transact affairs in this District; pursuant to 28 U.S.C. § 1965(b)

2   because the ends of justice require that the parties residing in any other district be brought before

3   this Court; pursuant to 28 U.S.C. §1291(b) because a substantial part of the events or omissions

4   giving rise to this action occurred in this District; and/or pursuant to 28 U.S.C. § 1391(b) because

5   one or more of the Defendants is subject to personal jurisdiction in this District.

6          8.     The Court has jurisdiction over Defendants RONALD BUCHHOLZ and

7   CHARICE FISCHER because RONALD BUCHHOLZ and CHARICE FISCHER own property

8   in the State of California. Several of the companies they manage, including RNC HOLDINGS,

9   list as their principal address 20 Great Oaks Blvd., Suite 230, San Jose, California.

10          9.     This Court has jurisdiction over Defendant RNC HOLDINGS, LLC ("RNC

11   HOLDINGS") because it maintains an office or a place of business in California, because it

12   regularly conducts business in the State of California, and because it purposefully directed the

13   activities complained of herein toward residents of California (including Plaintiffs) and otherwise

14   established contacts with California in participating in and otherwise engaging in the acts

15   described below.

16   **III.**

17   **PARTIES**

18         10.    Plaintiff THOMAS CIRRITO is, and at all times relevant was, a citizen of

19   Virginia. CIRRITO is, and at all times relevant was, a resident of Fairfax County, Virginia.

20   CIRRITO was an investor in the Courtyards at Lone Tree project and/or an owner in the

21   Courtyards at Lone Tree limited liability company. CIRRITO purchased the unqualified

22   securities from RNC HOLDINGS based on the misrepresentations discussed herein.

23         11.    Plaintiff ATOCHA LAND, LLC, is, and at all times relevant was, a Delaware

24   limited liability company, with its principal place of business in Virginia. Said corporation was

25   an investor in the Courtyards at Lone Tree project and/or an owner in the Courtyards at Lone Tree

26   limited liability company. Said corporation purchased the unqualified securities from RNC

27   HOLDINGS based on the misrepresentations discussed herein.

28         12.    Defendant RNC HOLDINGS is a Nevada corporation and maintains an office in

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1  San Jose, Santa Clara County, California.  RNC HOLDINGS, in connection with Defendants

2  RONALD BUCHHOLZ and CHARICE FISCHER, was the issuer of the unqualified securities

3  for investment procured by the Plaintiffs herein.

4       13.    On information and belief, Defendant RONALD BUCHHOLZ is, and at all times

5  relevant was, a citizen of California.  Defendant BUCHHOLZ, at all times relevant was, a

6  resident of Santa Clara County, California.

7       14.    On information and belief, Defendant CHARICE FISCHER is, and at all times

8  relevant was, a citizen of California.  Defendant FISCHER, at all times relevant was, a resident of

9  Santa Clara County, California.

10       15.    Plaintiffs do not know the true names of Defendants DOES 1 through 50 and

11  therefore sue them by those fictitious names.  Plaintiffs are informed and believe and on that basis

12  alleges, that at all times mentioned in this complaint, DOES 1 through 50 were the agents and

13  employees of their co-Defendants, and in performing the acts and omissions alleged in this

14  complaint were acting within the course and scope of that agency and employment.

### IV.

### FACTUAL ALLEGATIONS

**A.**    **Defendants' Alleged Real Estate Investment Companies**

18       16.    According to the corporate filing with the Nevada Secretary of State for Defendant

19  RNC HOLDINGS, LLC, Defendants BUCHHOLZ and FISCHER are Managers of the company.

20       17.    Defendants BUCHHOLZ, FISCHER, and RNC HOLDINGS acted as the "issuers"

21  of the unqualified securities to Plaintiffs.  Defendants BUCHHOLZ, FISCHER, and RNC

22  HOLDINGS secured investments from investors, including Plaintiffs, in numerous different

23  investment vehicles, such as raw land developments and acquisition and development projects.

24  The investor funds were placed in different positions within the project, inclusive of debt and

25  equity positions.

26       18.    Based on information and belief, Defendants BUCHHOLZ, FISCHER, and RNC

27  HOLDINGS moved or transferred Plaintiffs' investments to additional projects without their

28  consent and encumbered the projects with additional debt without the consent of Plaintiffs.

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1      19.    Based on information and belief, Defendants BUCHHOLZ, FISCHER, and RNC

2    HOLDINGS improperly commingled the investor funds with their own and with those of the

3    other investors.

4    **B.    The Courtyards at Lone Tree Project**

5      20.    In or around January of 2006, Defendants BUCHHOLZ, FISCHER, and RNC

6    HOLDINGS proposed to Plaintiffs that they become partners in the Courtyards at Lone Tree

7    office condominium investment ("Courtyards at Lone Tree").  The project consisted of the

8    development of 5.42 acres of raw land located on Park Meadows Drive in Lone Tree, Colorado.

9      21.    Defendants BUCHHOLZ, FISCHER, and RNC HOLDINGS lacked funding for

10    the project.  In an effort to obtain an equity down payment, Defendants offered Plaintiffs a 50%

11    ownership share in Courtyards at Lone Tree, LLC in exchange for $2,600,000.00.  Defendants

12    represented both orally and in writing that Plaintiffs would receive more than a 50% return on

13    their investments.

14      22.    In March of 2006, Defendants executed an Operating Agreement with Plaintiffs.

15    Under the terms of the Operating Agreement, Plaintiffs were to contribute $2,600,000.00 to the

16    project as equity in exchange for a 50% ownership interest in Courtyards at Lone Tree, LLC.  A

17    true and correct copy of the Operating Agreement sent to Plaintiffs is attached hereto as Exhibit

18    "A" to the Complaint.

19      23.    As part of this Operating Agreement, Defendant BUCHHOLZ took a

20    "development fee" of $600,000.00 and a "construction management fee" of $250,000.00.

21      24.    A Project Pro Forma was sent to Plaintiffs on January 25, 2006 to induce their

22    signature to the Operating Agreement.  This Pro Forma indicated that the only capital

23    contribution required of Plaintiffs was the initial $2,600,000.00 in required equity.  The Pro

24    Forma also indicated that Plaintiffs would see a Total Project Profit of $1,642,230.00, which

25    constituted a 63.16% return on investment.  A true and correct copy of the Project Pro Forma sent

26    to Plaintiffs on January 25, 2006 is attached hereto as Exhibit "B" to the Complaint.

27    **C.    The Sale of Unqualified Securities**

28      25.    The investments sold to the Plaintiff investors qualify as "securities" pursuant to

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    Cal. Corporations Code § 25019. Defendants BUCHHOLZ, FISCHER, and RNC HOLDINGS

2    qualify as the "issuers" and "broker-dealers" of the securities.

3         26.    Based on information from governmental securities regulation administrations,

4    Defendants BUCHHOLZ, FISCHER, and RNC HOLDINGS have neither qualified for nor

5    exempted themselves from qualification of the "securities" in accordance with Cal. Corporations

6    Code 25110.

7         27.    Plaintiffs were unsophisticated real estate investors and relied upon the

8    representations of Defendants BUCHHOLZ and FISCHER. The risks associated with the

9    investments were not explained to the Plaintiff investors, who were unsophisticated and relied

10   upon Defendants BUCHHOLZ, FISCHER, and RNC HOLDINGS in making their investment

11   decisions. The reliance of the Plaintiff investors upon the representations, information and

12   promises by Defendants BUCHHOLZ, FISCHER, and RNC HOLDINGS was justified based

13   upon the fiduciary role and apparent experience.

14        28.    The Plaintiff investors had no say or control over their funds, the nature or types of

15   positions in which they were placed, the addition or removal of investors in the project, the

16   expenditure of the funds for development projects, or the administration of the funds.

17        29.    Under the Operating Agreement, Defendant BUCHHOLZ took a "development

18   fee" of $600,000.00 and a "building construction management fee" of $250,000.00 as part of the

19   project.

20        30.    Defendants BUCHHOLZ, FISCHER, and RNC HOLDINGS, as the principals of

21   the company, acted as the managing members for the Courtyards at Lone Tree project.

22   Defendants BUCHHOLZ, FISCHER, and RNC HOLDINGS, therefore, held fiduciary duty

23   obligations to the Plaintiff investors that were breached pursuant to the acts set forth herein.

24   **D.    Police Raid the Office of BUCHHOLZ and FISCHER to Investigate Allegations of
         Defendants' Fraudulent Investment Schemes**

25

26        31.    On or around July 24, 2007, the offices of Defendants BUCHHOLZ and

27   FISCHER were raided by both state and federal authorities in connection with a warrant to

     investigate allegations of fraudulent investment schemes. Due to Plaintiffs' location in Virginia

28

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1   and the lack of press coverage of the raid even locally, Plaintiffs did not learn of the raid until

2   Defendant FISCHER sent an email to all investors claiming that she knew of no reason for the

3   raid and speculating that it was related to an ongoing lawsuit with prior members of Defendants'

4   investment group.

5       32.    Based on information and belief, Defendants' activities are presently under

6   investigation by state and federal authorities in connection with the allegations of fraudulent

7   investment schemes.  Based on information and belief, the pending indictment has not been

8   dismissed.

9       33.    Based on information and belief, the state and federal authorities seized the

10  contents of the offices of Defendants BUCHHOLZ and FISCHER in connection with the state

11  and federal investigation and the pending indictments.

12                              **V.**

13  **COUNT 1:  VIOLATION OF SECTION 10B AND RULE 10B-5 OF THE 1934 ACT**

14  **(Against Defendants BUCHHOLZ, FISCHER, RNC HOLDINGS, and DOES 1-50)**

15      34.    Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 33,

16  inclusive, as though fully set forth herein.

17      35.    Defendants engaged in a scheme to secure investment funds from Plaintiffs and

18  take nearly $1,000,000 in fees up front, resulting in an undercapitalization of the project to the

19  point that it was unsaleable.  In order to obtain the funds, Defendants promised Plaintiffs, both

20  orally and in writing, a return on investment greater than 50%.  At the time Defendants made

21  these statements, Defendants knew or recklessly disregarded that the statements were misleading

22  in that they contained misrepresentations and failed to disclose material facts necessary in order

23  to make the statements made, in light of the circumstances under which they were made, not

24  misleading.

25      36.    Defendants violated §10(b) and Rule 10b-5 of the 1934 Act in that they:

26          (a)    Employed devices, schemes and artifices to defraud Plaintiffs;

27

28

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs by securing investment funds from Plaintiff in order to provide investment returns to prior investors in the same property.

37.    Plaintiffs have suffered damages in that, in reliance on Defendants' representations of a return on investment greater than 50%, Plaintiffs invested funds into a project that was undercapitalized and unsaleable due to Defendants extraction of nearly $1,000,000 in fees at the outset of the project.  Plaintiffs would not have invested in the property at the rate presented, or at all, if they had been aware that Defendants knew at the time they made the representation, that they could not provide a greater than 50% return on investment, and that Defendants intended to extract nearly $1,000,000 in fees from the project at the outset, leaving it undercapitalized and unsaleable.

38.    As a direct and proximate result of Defendants' violation of §10(b) and Rule 10b-5 of the 1934 Act, Plaintiffs have been injured in their business and property in that Plaintiffs were induced into an investment by a promise of a greater than 50% return on investment that Defendants knew was not true at the time they made it, and in that the property became unsaleable after Defendants extracted nearly $1,000,000 in fees from the project at the outset. Plaintiffs have incurred and continue to incur legal fees and costs to recover such losses and any potential judgments against Defendants in the pending lawsuits.

## VI.

### COUNT 2:  RESCISSION BASED ON MATERIAL MISREPRESENTATION AND SECURITIES TRANSACTION PURSUANT TO CAL. CORP. CODE SECTIONS 25501 AND 25401

**(Against Defendants RNC HOLDINGS, BUCHHOLZ, FISCHER, and DOES 1-50)**

39.    Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 38, inclusive, as though fully set forth herein.

40.    In or about December 2005, Defendants RNC HOLDINGS, BUCHHOLZ, and

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

FISCHER, offered and sold to Plaintiffs 50% of the membership interest in Courtyards at Lone

Tree, LLC, in exchange for $2,600,000.00. At that time, Defendants represented that they

intended to develop the project and that Plaintiffs would receive a return on their investments. On

information and belief, Defendants engaged in a scheme to secure investment funds from

Plaintiffs and take nearly $1,000,000 in fees up front, resulting in an undercapitalization of the

project to the point that it was unsaleable. In order to obtain the funds, Defendants promised

Plaintiffs, both orally and in writing, a return on investment greater than 50%. Plaintiffs would

not have invested in the property at the rate presented, or at all, if they had been aware that

Defendants knew at the time they made the representation, that they could not provide a greater

than 50% return on investment, and that Defendants intended to extract nearly $1,000,000 in fees

from the project at the outset, leaving it undercapitalized and unsaleable.

      41.     Defendants RNC HOLDINGS, BUCHHOLZ, and FISCHER, in connection with

the sale of securities to Plaintiffs regarding the Courtyards at Lone Tree project (See Exhibit

"B"), misrepresented the actual return or "profit" to Plaintiffs. The Project Pro Forma states:

"Total Project Profit: $1,642,230." To date, Plaintiffs have received no return on investment

from the Courtyards at Lone Tree project.

      42.     Defendants RNC HOLDINGS, BUCHHOLZ, and FISCHER misrepresented to

Plaintiffs that they were buying into a viable investment opportunity for an office condominium

project. The reality, however, was the that Defendants RNC HOLDINGS, BUCHHOLZ, and

FISCHER, through the investment scheme, knew that they could not provide a greater than 50%

return on Plaintiffs' investment at the time they represented they could, and that Defendants

intended to extract nearly $1,000,000 in fees from the project at the outset, leaving it

undercapitalized and unsaleable.

      43.     As a result of the material misrepresentations and omissions, Plaintiffs are entitled

to rescind the above-described purchases of membership interest in Courtyards at Lone Tree,

LLC.

      44.     Plaintiffs will tender to Defendants their membership interest in Courtyards at

Lone Tree, LLC, in exchange for a rescission of the investment amount of $2,600,000 that

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1   Plaintiffs paid Defendants for the above-described securities and on which to date Plaintiffs have

2   received $0 in total income.

3       45.    Therefore, Plaintiffs seek an Order of this Court for the appropriate available

4   remedy of rescission and return of Plaintiffs' investment capital with interest from the date of the

5   investment pursuant to Cal. Corp. Code §§ 25501 and 25401.

6                                              **VII.**

7   **COUNT 3: RESCISSION OF SALE OF SECURITIES NOT QUALIFIED FOR SALE**
    **AND RESTITUTION OF CONSIDERATION PAID PURSUANT TO CAL. CORP. CODE**
8                   **SECTIONS 25503, 25102(F), AND 25110**

9       **(Against Defendants RNC HOLDINGS, BUCHHOLZ, FISCHER, and DOES 1-50)**

10      46.    Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 45,

11  inclusive, as though fully set forth herein.

12      47.    On or about February 2005, Defendants BUCHHOLZ, FISCHER, and RNC

13  HOLDINGS, offered and sold to Plaintiffs and investors a total of $2,600,000.00 of membership

14  interest in Courtyards at Lone Tree, LLC. Defendants were the issuers of the investments and

15  engaged in the trading of such securities. The Operating Agreement for the Courtyards at Lone

16  Tree project is attached hereto as Exhibit "A".

17      48.    This sale constituted an issuer transaction in that it was an offering of membership

18  interest for capitalization purposes for Courtyards at Lone Tree, LLC. The issuers directly

19  benefited from Plaintiffs' investment of securities and received a portion of the investments as the

20  issuer of the security. At the time of Plaintiffs' acquisition and membership interests and

21  investment in Courtyards at Lone Tree, LLC, the sale was subject to qualification, was not

22  exempt from qualification, and was not, and to the date of this Complaint, has not been qualified

23  as any kind of securities transaction with the Commissioner of Corporations.

24      49.    As a result of the above-described acts, Defendants are liable to Plaintiffs, who are

25  entitled to and hereby do, rescind the above-described purchase. Plaintiffs will tender to

26  Defendants their membership interest in Courtyards at Lone Tree, LLC, in exchange for a

27  rescission of the investment amount of $2,600,000 that Plaintiffs paid Defendants for the above-

28  described securities and on which to date Plaintiffs have received $0 in total income.

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1    50.    Plaintiffs have been damaged in an amount to be proven at trial. Therefore,

2    Plaintiffs seek an Order of this Court for all appropriate available remedies under California

3    Corporations Code §§ 25503, 25102(f), and 25110.

**VIII.**

**COUNT 4:  BREACH OF FIDUCIARY DUTY**

**(Against Defendants RNC HOLDINGS, BUCHHOLZ, FISCHER and DOES 1-50)**

7    51.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 50,

8    inclusive, as though set forth fully herein.

9    52.    Defendants RNC HOLDINGS, BUCHHOLZ, and FISCHER had a special

10    relationship with Plaintiffs, in that Defendants assumed a fiduciary position in relation to the

11    investors as investment advisers, trustees of the accounts, and managing partners of projects,

12    ventures, and the limited liability company.  As such, Defendants were fiduciaries as to Plaintiffs.

13    Defendants breached their fiduciary duty to Plaintiffs by failing to make full disclosure of all

14    material facts concerning the transactions that might have affected Plaintiffs' investment

15    decisions.  The Plaintiffs' losses were caused by and have resulted directly and proximately from

16    the action, misrepresentations, and omissions of Defendants.

17    53.    As fiduciaries, Defendants owed a duty of utmost care, integrity, honesty and

18    loyalty toward Plaintiffs.  Defendants breached their fiduciary duty to Plaintiffs by, among other

19    things, misrepresenting that Plaintiffs were contributing to the development of land purchased by

20    Defendants, and that Plaintiffs would receive a rate of return on their investments.  Plaintiffs were

21    lured into transactions believing that Defendants were applying Plaintiffs' funds toward

22    development of the property.  On information and belief, Defendants engaged in a scheme to

23    secure investment funds from Plaintiffs and take nearly $1,000,000 in fees up front, resulting in

24    an undercapitalization of the project to the point that it was unsaleable.  In order to obtain the

25    funds, Defendants promised Plaintiffs, both orally and in writing, a return on investment greater

26    than 50%.  Plaintiffs would not have invested in the property at the rate presented, or at all, if they

27    had been aware that Defendants knew at the time they made the representation, that they could

28    not provide a greater than 50% return on investment, and that Defendants intended to extract

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

1   nearly $1,000,000 in fees from the project at the outset, leaving it undercapitalized and

2   unsaleable.

3       54.     As a direct and proximate result of the breach of fiduciary duty by Defendants,

4   Plaintiffs have been injured in their business and property in that Plaintiffs were induced into an

5   investment by a promise of a greater than 50% return on investment that Defendants knew was

6   not true at the time they made it, and in that the property became unsaleable after Defendants

7   extracted nearly $1,000,000 in fees from the project at the outset.  Plaintiffs have incurred and

8   continue to incur legal fees and costs to recover such losses and any potential judgments against

9   Defendants in the pending lawsuits.

10      55.     The Defendants' conduct as described above, involved malice, oppression and

11  fraud, and such conduct was clearly despicable.  Such despicable and fraudulent conduct was

12  plainly conducted by the officers, directors, and/or managing agents of these Defendants and was

13  ratified by them, and by the Defendant corporation, RNC HOLDINGS.  Accordingly, the Court

14  should assess punitive damages against these Defendants.

## IX.

## PRAYER FOR RELIEF

17  Wherefore, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

18      1.      For rescission of the purchase and recovery of investment capital as the original

19              consideration paid for the securities at issue;

20      2.      For interest on the value of the original consideration at the legal rate from the date

21              of purchase and transfer of the consideration;

22      3.      For costs of suit herein incurred;

23      4.      For recovery of attorneys' fees;

24  ///

25  ///

26  ///

27  ///

28  ///

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

5.     For punitive damages; and

6.     For such other and further relief as the Court may deem proper.

Dated: July 18, 2008                                    ROPERS, MAJESKI, KOHN & BENTLEY


                                                        By: _____
                                                        TODD A. ROBERTS
                                                        JESSHILL E. LOVE
                                                        Attorneys for Plaintiffs
                                                        THOMAS CIRRITO, AN INDIVIDUAL;
                                                        AND ATOCHA LAND, LLC, A
                                                        DELAWARE LIMITED LIABILITY
                                                        COMPANY

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

**DEMAND FOR JURY TRIAL**

Plaintiffs THOMAS CIRRITO and ATOCHA LAND, LLC hereby demand a jury trial in this matter.

Dated: July 18, 2008

ROPERS, MAJESKI, KOHN & BENTLEY

By: _____
TODD A. ROBERTS
JESSHILL E. LOVE
Attorneys for Plaintiffs
THOMAS CIRRITO, AN INDIVIDUAL;
AND ATOCHA LAND, LLC, A
DELAWARE LIMITED LIABILITY
COMPANY

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

RC1/5146233.1/BRL

- 14 -

COMPLAINT

**EXHIBIT A**

**OPERATING AGREEMENT**

**OF**

**COURTYARDS AT LONE TREE, LLC,**

**A COLORADO LIMITED LIABILITY COMPANY**

**EFFECTIVE AS OF NOVEMBER 29, 2005**

THE INTERESTS (THE "INTERESTS") OF THE MEMBERS OF COURTYARDS AT LONE TREE, LLC ARE SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER TERMS AND CONDITIONS SET FORTH IN THIS AGREEMENT. THE INTERESTS HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED (i) UNDER ANY STATE SECURITIES LAWS (THE "STATE ACTS"), OR (ii) UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "FEDERAL ACT"). NEITHER THE INTERESTS NOR ANY PART THEREOF MAY BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD, ASSIGNED OR TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH THE TERMS AND CONDITIONS OF THIS AGREEMENT AND (1) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER ANY APPLICABLE STATE ACT OR IN A TRANSACTION WHICH IS EXEMPT FROM REGISTRATION UNDER SUCH STATE ACT OR WHICH IS OTHERWISE IN COMPLIANCE WITH SUCH STATE ACT AND (2) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE FEDERAL ACT OR IN A TRANSACTION WHICH IS EXEMPT FROM REGISTRATION UNDER THE FEDERAL ACT OR WHICH IS OTHERWISE IN COMPLIANCE WITH THE FEDERAL ACT.

# TABLE OF CONTENTS

Page

**ARTICLE 1 -- DEFINITIONS** ................................................................. 1

1.1    Agreement ................................................................. 1
1.2    Articles of Organization ................................................................. 1
1.3    Atocha ................................................................. 1
1.4    Capital Account ................................................................. 1
1.5    Capital Contribution ................................................................. 1
1.6    Code ................................................................. 1
1.7    Colorado Act ................................................................. 1
1.8    Company ................................................................. 1
1.9    CY ................................................................. 1
1.10   Deficit Capital Account ................................................................. 1
1.11   Distributable Cash ................................................................. 2
1.12   Economic Interest ................................................................. 2
1.13   Effective Date ................................................................. 2
1.14   Entity ................................................................. 2
1.15   Event of Default ................................................................. 2
1.16   Family Member ................................................................. 2
1.17   Fiscal Year ................................................................. 2
1.18   Gifting Member ................................................................. 2
1.19   Incompetence of Manager ................................................................. 3
1.20   Interest Rate ................................................................. 3
1.21   Lender Member ................................................................. 3
1.22   Majority Interest ................................................................. 3
1.23   Manager ................................................................. 3
1.24   Member ................................................................. 3
1.25   Membership Interest ................................................................. 3
1.26   Meridian ................................................................. 3
1.27   Person ................................................................. 3
1.28   Pro Rata ................................................................. 3
1.29   Profits and Losses ................................................................. 3
1.30   Profits Interests ................................................................. 4
1.31   Property ................................................................. 4
1.32   Rejecting Member ................................................................. 4
1.33   RNC ................................................................. 4
1.34   Selling Member ................................................................. 4
1.35   TMM ................................................................. 4
1.36   Transferring Member ................................................................. 4
1.37   Transferee ................................................................. 4
1.38   Treasury Regulations ................................................................. 4
1.39   Voting Interests ................................................................. 4

**ARTICLE 2 -- FORMATION OF COMPANY** ................................................................. 5

2.1    Formation ................................................................. 5
2.2    Name ................................................................. 5
2.3    Principal Place of Business ................................................................. 5
2.4    Registered Office and Registered Agent ................................................................. 5

2.5    Term ..................................................................................................................... 5

**ARTICLE 3 -- BUSINESS OF COMPANY** ................................................................. 5

3.1    Permitted Businesses ........................................................................................... 5

**ARTICLE 4 -- NAMES AND ADDRESSES OF MEMBERS** .................................... 5

**ARTICLE 5 -- RIGHTS AND DUTIES OF MANAGER** ............................................ 5

5.1    Management ......................................................................................................... 5
5.2    Number, Tenure and Qualifications .................................................................... 6
5.3    Successor Manager .............................................................................................. 6
5.4    Certain Powers of Manager ................................................................................. 6
5.5    Restrictions on Authority of the Manager .......................................................... 7
5.6    Liability for Certain Acts .................................................................................... 7
5.7    Manager and Members Have No Exclusive Duty to Company ........................... 7
5.8    Bank Accounts ..................................................................................................... 8
5.9    Indemnification .................................................................................................... 8
5.10   Resignation .......................................................................................................... 8
5.11   Removal; Vacancies ............................................................................................ 8
5.12   Reimbursements and Salaries ............................................................................. 8
5.13   Right to Rely on the Manager ............................................................................. 8
5.14   Contracts with Affiliates ..................................................................................... 8

**ARTICLE 6 -- RIGHTS AND OBLIGATIONS OF MEMBERS** ............................... 9

6.1    Limitation of Liability ......................................................................................... 9
6.2    Company Debt Liability ...................................................................................... 9
6.3    Company Books ................................................................................................... 9
6.4    Priority and Return of Capital ............................................................................ 9
6.5    Liability of the Company With Respect to Distributions. .................................. 9
6.6    Defaulting Member ............................................................................................. 9
6.7    No Voting Rights During Default ....................................................................... 9

**ARTICLE 7 -- MEETINGS OF MEMBERS** ............................................................. 10

7.1    Meetings ............................................................................................................ 10
7.2    Notice of Meetings ............................................................................................ 10
7.3    Meeting of all Members ..................................................................................... 10
7.4    Record Date ....................................................................................................... 10
7.5    Quorum .............................................................................................................. 10
7.6    Manner of Acting. ............................................................................................. 10
7.7    Proxies ............................................................................................................... 11
7.8    Action by Members Without a Meeting ............................................................ 11
7.9    Waiver of Notice ............................................................................................... 11

**ARTICLE 8 -- CONTRIBUTIONS TO THE COMPANY; CAPITAL ACCOUNTS; LOANS** ...... 11

8.1    Members' Capital Contributions ....................................................................... 11
8.2    Additional Contributions ................................................................................... 11
8.3    Capital Accounts ............................................................................................... 11
8.4    Withdrawal or Reduction of Capital Contributions .......................................... 12
8.5    Loans to Finance On-Going Operations ............................................................ 12

**ARTICLE 9 -- ALLOCATIONS, DISTRIBUTIONS, ELECTIONS AND REPORTS** ......... 13

9.1    Allocations of Profits and Losses ...................................................................... 13
9.2    Special Allocations ............................................................................................ 13

| | | |
|---|---|---|
| 9.3 | Qualified Income Offset | 13 |
| 9.4 | Curative Allocations | 14 |
| 9.5 | Income Tax Allocations | 14 |
| 9.6 | Distributions | 14 |
| 9.7 | Distributions in Kind | 15 |
| 9.8 | Limitations Upon Distributions | 15 |
| 9.9 | Accounting Principles | 15 |
| 9.10 | Interest On and Return of Capital Contributions | 15 |
| 9.11 | Accounting Period | 15 |
| 9.12 | Records, Audits and Reports | 15 |
| 9.13 | Returns and Other Elections | 16 |
| 9.14 | Tax Matters Member | 16 |
| 9.15 | Financial Statements and Reports | 16 |

**ARTICLE 10 -- TRANSFERABILITY** ........................................................................................ 16

| | | |
|---|---|---|
| 10.1 | General | 16 |
| 10.2 | Right of First Refusal | 17 |
| 10.3 | Gifting of Membership Interest | 18 |
| 10.4 | Miscellaneous Requirements | 19 |
| 10.5 | Specific Enforcement | 19 |
| 10.6 | Transfer Indemnity | 19 |

**ARTICLE 11 -- ADDITIONAL MEMBERS** ............................................................................... 19

**ARTICLE 12 -- DISSOLUTION AND TERMINATION** ........................................................ 20

| | | |
|---|---|---|
| 12.1 | Dissolution | 20 |
| 12.2 | Effect of Filing of Dissolving Statement | 20 |
| 12.3 | Winding Up, Liquidation and Distribution of Assets | 20 |
| 12.4 | Articles of Dissolution | 21 |
| 12.5 | Certificate of Dissolution | 21 |
| 12.6 | Return of Contribution Nonrecourse to Other Members | 21 |

**ARTICLE 13 -- MISCELLANEOUS PROVISIONS** ................................................................ 21

| | | |
|---|---|---|
| 13.1 | Liability; Indemnification | 21 |
| 13.2 | Notices | 22 |
| 13.3 | Books of Account and Records | 22 |
| 13.4 | Application of Colorado Law | 22 |
| 13.5 | Waiver of Action for Partition | 22 |
| 13.6 | Entireties; Amendments | 22 |
| 13.7 | Investment Representations | 23 |
| 13.8 | Execution of Additional Instruments | 23 |
| 13.9 | Waivers | 23 |
| 13.10 | Rights and Remedies Cumulative | 23 |
| 13.11 | Severability | 23 |
| 13.12 | Heirs, Successors and Assigns | 24 |
| 13.13 | Creditors | 24 |
| 13.14 | Counterparts | 24 |
| 13.15 | Rule Against Perpetuities | 24 |
| 13.16 | Further Assurances | 24 |

# OPERATING AGREEMENT

## OF

## COURTYARDS AT LONE TREE, LLC,
## A COLORADO LIMITED LIABILITY COMPANY

THIS OPERATING AGREEMENT OF COURTYARDS AT LONE TREE, LLC is executed as of the dates hereinafter set forth by and among ATOCHA (as hereinafter defined) and RNC (as hereinafter defined), together with any other Persons (as hereinafter defined) who become Members (as hereinafter defined) in the Company (as hereinafter defined) in the manner provided herein.

The parties agree as follows:

### ARTICLE 1 -- DEFINITIONS

The following terms used herein shall have the following meanings (unless otherwise expressly provided herein);

1.1     "Agreement" shall mean this Operating Agreement as originally executed and as amended, from time to time.

1.2     "Articles of Organization" shall mean the Articles of Organization of the Company, as filed with the Secretary of State of Colorado, as the same may be amended, from time to time.

1.3     "Atocha" shall mean Atocha Land, LLC, a _____ limited liability company.

1.4     "Capital Account" shall mean the capital account established, maintained and adjusted for each Member in accordance with Section 8.3.

1.5     "Capital Contribution" shall mean the cash which a Member contributes to the Company. Capital Contributions shall not include obligations to contribute at a future date, until such contributions are actually made and valued accordingly.

1.6     "Code" shall mean the Internal Revenue Code of 1986 or corresponding provisions of subsequent superseding federal revenue laws.

1.7     "Colorado Act" shall mean the Colorado Limited Liability Company Act at C.R.S. § 7-80-101, *et seq.*, as amended from time to time.

1.8     "Company" shall refer to Courtyards at Lone Tree, LLC.

1.9     "CY" shall mean calendar year.

1.10     "Deficit Capital Account" shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the taxable year, after giving effect to the following adjustments:

(a)     credit to such Capital Account any amount which such Member is obligated to restore under Section 1.704-1(b)(2)(ii)(c) of the Treasury Regulations, as well as any addition thereto

pursuant to the next to last sentence of Sections 1.704-2(g)(1) and (i)(5) of the Treasury Regulations, after taking into account thereunder any changes during such year in partnership minimum gain (as determined in accordance with Section 1.704 2(d) of the Treasury Regulations) and in the minimum gain attributable to any partner non-recourse debt (as determined under Section 1.704-2(i)(3) of the Treasury Regulations); and

      (b)    debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Treasury Regulations.

      (c)    This definition of Deficit Capital Account is intended to comply with the provision of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and 1.704-2, and will be interpreted consistently with those provisions.

      1.11    "Distributable Cash" shall mean all cash, revenues and funds received by the Company (other than Capital Contributions, loan proceeds and security deposits or other funds held for third parties), less the sum of the following to the extent paid or set aside by the Company: (a) all principal and interest payments on indebtedness of the Company and all other sums paid to or accrued for lenders; (b) all cash expenditures incurred or accrued incident to the normal operation of the Company's business; (c) such reserves as the Manager, in his discretion, deems necessary in connection with the proper operation of the Company's business.

      1.12    "Economic Interest" shall mean a Member's share of the Company's Profits, Losses, Distributable Cash and Net Capital Proceeds pursuant to this Agreement and the Colorado Act. An Economic Interest is separate and distinct from a Voting Interest and ownership solely of an Economic Interest does not include any right to participate in the management or affairs of the Company, the right to be present at any meeting of Members or the right to vote on, consent to or otherwise participate in any decision of the Members or the Manager.

      1.13    "Effective Date" shall mean November 29, 2005.

      1.14    "Entity" shall mean any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative or association or any foreign trust or foreign business organization.

      1.15    "Event of Default" shall mean the failure by a Member to perform any material obligation hereunder or comply with any laws applicable to limited liability companies generally; and, thereafter, such Member shall fail to cure such failure to perform or comply no later than fifteen (15) calendar days after receiving written notice thereof from the Manager or the date specified or other time limitation provided in this Agreement or in such notice; or if such failure to perform or comply, by its nature, cannot be cured within such applicable time period, then shall fail to begin such cure within such applicable time period or thereafter fail to diligently pursue same.

      1.16    "Family Member" shall mean (a) an Individual, (b) the estate of an Individual, or (c) an Entity created by, or on behalf of, a Member including, without limitation, a trust or family limited partnership.

      1.17    "Fiscal Year" shall mean the Company's fiscal year, which shall be the calendar year.

      1.18    "Gifting Member" shall mean any Member who gifts, bequeaths or otherwise transfers for no consideration (by operation of law or otherwise, except with respect to bankruptcy) all or any part of its Membership Interest.

1.19    "Incompetence of Manager" shall be presumed if the project is experiencing cost overruns in excess of 125% which are not the result of (a) cost increases for materials that are consistent with increasing market rates (b) cost increases due to modifications of the project plans that are determined to increase marketability and/or sales revenue or (c) cost increases arising from changes to the specifications of the project that could not have been reasonably foreseen by the Manager.

1.20    "Interest Rate" shall mean the prime rate of interest as established, from time to time, in the *Wall Street Journal West* plus 200 basis points. In the event the *Wall Street Journal West* ceases to exist or stops publishing the prime rate, the Company shall use the prime rate published by U.S. Bank or a comparably sized banking institution.

1.21    "Lender Member" shall mean a Member who loans money to the Company pursuant to Section 8.5 below.

1.22    "Majority Interest" with respect to any issue shall mean one or more Members holding Voting Interests, which, taken together, exceed sixty six percent (66%) of the Voting Interests held in the aggregate by all Members entitled to consent, vote and agree with respect to such issue.

1.23    "Manager" shall mean Ronald Buchholz, an individual, and Charice Buchholz, an individual. References to the Manager in the singular or as him, her, it, itself, or other like references shall also, where the context so requires, be deemed to include the plural or the masculine, feminine or neuter reference, as the case may be.

1.24    "Member" shall mean each of the parties who execute this Agreement as a Member and each of the parties who may hereafter become Members. To the extent a Manager has acquired Membership Interests in the Company, he will have all the rights of a Member with respect to such Membership Interests, and the term "Member" as used herein shall include a Manager to the extent he has acquired such Membership Interests in the Company.

1.25    "Membership Interest" shall mean a Member's entire interest in the Company, as provided under this Agreement and the Colorado Act, including such Member's Economic Interest and Voting Interest.

1.26    "Meridian" shall mean Meridian Partners, LLC.

1.27    "Person" shall mean any individual or Entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such "Person" where the context so permits.

1.28    "Pro Rata" shall mean: (a) with respect to any matter upon which Members or any of them are voting, in accordance with their Voting Interests; and (b) with respect to all other matters, in accordance with the respective total Capital Contributions of the Members, initially as specified in Section 8.1 hereof, but subject to modifications based on their respective total Capital Contributions.

1.29    "Profits" and "Losses" shall mean for each taxable year of the Company an amount equal to the Company's net taxable income or loss for such year as determined for federal income tax purposes in accordance with the accounting method and rules used by the Company and in accordance with Code Section 703(a) (for such purpose, all items of income, gain, loss, deduction or credit required to be separately stated pursuant to Code Section 703(a)(1) being included in taxable income or loss), subject to the following modifications:

(a)    any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses shall be added to such taxable income or loss;

(b)    any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Code Section 705(a)(2)(B) expenditures pursuant to Section 1.704 1(b)(2)(iv)(i) of the Treasury Regulations, and not otherwise taken into account, shall be subtracted from such taxable income or loss;

(c)    with respect to Company property which, in conformity with Treasury Regulations, has a book value greater than or less than its adjusted tax basis, "Profits" and "Losses" of the Company shall be determined by reference to the depreciation and amortization deduction, if any, allowable with respect to such property as computed for book purposes (and not for tax purposes), as determined pursuant to Section 1.704 1(b)(2)(iv)(g) of the Treasury Regulations, and by the gain or loss attributable to such property as computed for book purposes (and not for tax purposes), by reference to such property's adjusted book value; and

(d)    all items of income, gain, loss, deduction and credit allocated to the Members pursuant to Section 9.2 of this Agreement shall not be taken into account in computing such taxable income or loss.

1.30    "Profits Interests" shall mean the interests of the Members in the Profits of the Company as set forth in Section 9.1(b).

1.31    "Property" shall mean that certain unimproved real property located in the City of Lone Tree, County of Douglas, State of Colorado, and legally described on Exhibit A, attached hereto and incorporated by this reference.

1.32    "Rejecting Member" shall mean any Member who fails to exercise his right of first refusal in accordance with Section 10.2 of this Agreement.

1.33    "RNC" shall mean RNC Holdings, LLC, a Nevada limited liability company.

1.34    "Selling Member" shall mean any Member who sells, assigns, or otherwise transfers for consideration all or any portion of its Membership Interest.

1.35    "TMM" or "Tax Matters Member" is defined in Section 9.14 below.

1.36    "Transferring Member" shall mean either a Selling Member or a Gifting Member, as the context so depends.

1.37    "Transferee" shall mean any Person receiving a transfer of all or any portion of a Membership Interest from a Transferring Member.

1.38    "Treasury Regulations" shall include proposed, temporary and final regulations promulgated under the Code in effect as of the date of filing the Articles of Organization and the corresponding sections of any regulations subsequently issued that amend or supersede such regulations.

1.39    "Voting Interests" shall initially mean:

| | |
|---|---|
| Atocha | 50.00% |
| RNC | 50.00% |

## ARTICLE 2 -- FORMATION OF COMPANY

2.1     <u>Formation</u>.  On November 29, 2005, the Company was organized by executing and delivering Articles of Organization to the Colorado Secretary of State in accordance with and pursuant to the Colorado Act.

2.2     <u>Name</u>.  The name of the Company is Courtyards at Lone Tree, LLC.

2.3     <u>Principal Place of Business</u>.  The principal place of business of the Company within the State of Colorado shall be 5362 Hawthorn Trail, Littleton, Colorado, 80125. The Company may locate its places of business and registered office at any other place or places as the Manager may, from time to time, deems advisable.

2.4     <u>Registered Office and Registered Agent</u>.  The Company's initial registered office shall be at the office of its registered agent at 5362 Hawthorn Trail, Littleton, Colorado, 80125, and the name of its initial registered agent at such address shall be Tom Davidson, an individual. The registered office and registered agent may be changed from time to time by filing the address of the new registered office and/or the name of the new registered agent with the Colorado Secretary of State pursuant to the Colorado Act.

2.5     <u>Term</u>.  The Company shall continue in existence until it terminates upon the sale of all or substantially all of the Company's assets, upon written agreement of all Members, or as otherwise required by applicable law.

## ARTICLE 3 -- BUSINESS OF COMPANY

3.1     <u>Permitted Businesses</u>.  The business of the Company shall be:

(a)     to acquire, own, hold, sell, exchange, transfer, convey, encumber, mortgage, develop, entitle and lease the Property, or any part thereof or any interest therein;

(b)     to exercise all other powers necessary to or reasonably connected with the Company's business which may be legally exercised by limited liability companies under the Colorado Act; and,

(c)     to engage in all activities necessary, customary, convenient, or incident to any of the foregoing.

## ARTICLE 4 -- NAMES AND ADDRESSES OF MEMBERS

The names and addresses of the initial Members are set forth on <u>Schedule 4</u>.

## ARTICLE 5 -- RIGHTS AND DUTIES OF MANAGER

5.1     <u>Management</u>.

(a)     Except for situations in which the approval of the Members is expressly required by this Agreement or by non-waivable provisions of applicable law, each Manager acting alone shall have full and complete authority, power and discretion to direct, manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform all other acts customary or incidental to the management of the Company's business.

(b)     If the Managers are unable to agree on the action to be taken by the Company, the dispute shall be submitted to mediation in accordance with the commercial mediation rules of the AAA. Unless otherwise required by state law, mediation shall be conducted in the City and County of Denver, Colorado by a single mediator determined by the Managers. In the event the Managers are unable to agree upon a single mediator, each Manager shall select a mediator and the two chosen mediators shall then appoint a third mediator. The three mediators shall mediate the dispute between the Managers. A Manager may elect to mediate by sending written notice to the other Manager, invoking the provisions of this Section. Each Manager shall bear his own attorney's fees and, to the extent applicable, the costs of his own mediator. Otherwise, the cost of mediation shall be borne equally by the Managers, including, without limitation, the costs of the third mediator (if any).

(c)     If, upon mediation, the Managers are unable or unwilling to agree on the action to be taken by the Company, the matter shall be submitted to binding arbitration in accordance with the commercial arbitration rules of the AAA. Unless otherwise required by state law, arbitration shall be conducted in the City and County of Denver, Colorado by a single arbitrator determined by the Managers. In the event the Managers are unable to agree upon a single arbitrator, each Manager shall select an arbitrator and the two chosen arbitrators shall then appoint a third arbitrator. The three arbitrators shall make a decision with respect to the disputed matter. A Manager may elect to arbitrate by sending written notice to the other Manager(s) no later than ten (10) days after the conclusion of the mediation described above, invoking the binding arbitration provisions of this Section. Each Manager shall bear his own attorney's fees and, to the extent applicable, the costs of his own arbitrator. Otherwise, the cost of arbitration shall be borne equally by the Managers, including, without limitation, the cost of the third arbitrator (if any). To the extent practicable, the Managers shall cause the arbitration to occur in an expeditious fashion.

5.2     Number, Tenure and Qualifications.  At all times, the Company shall have two (2) Managers. Initially, Ronald Buchholz, an individual, and Charice Buchholz, an individual, shall serve as the Manager. The Manager shall hold office until the earlier of the following: resignation, death or removal or determination of Incompetence of a Manager. The Manager need not be a natural person. In the event a Manager is a natural person, such Manager shall be at least eighteen years of age. References to the Manager in the singular or as him, her, it, itself, or other like references shall also, where the context so requires, be deemed to include the plural or the masculine, feminine or neuter reference, as the case may be.

5.3     Successor Manager.  No later than fifteen (15) calendar days after the resignation, death or removal of a Manager, the affirmative vote of Members holding at least a Majority Interest shall elect a successor Manager. In the event of a determination of Incompetence of a Manager, Thomas Cirrito shall be appointed a Manager of the Company.

5.4     Certain Powers of Manager.

(a)     Without limiting the generality of Section 5.1, all decisions relating to the management and control of the conduct of the business of the Company and its affairs shall be made by the Managers, including, but not limited to, decisions relating to any of the following:

(i)     the selection of representatives of the Company to serve o the management, supervisory or other governing boards or bodies of any company or other organization in which the Company owns an interest;

(ii)     the hiring and termination of employees of the Company;

(iii)     distributions to the Members;

(iv)    the opening of bank accounts, the making of loans to any third party, the incurrence or refinancing of indebtedness of the Company, and the encumbering of Company property;

(v)    the selection of attorneys, accountants, appraisers and agents; and

(vi)    the entry into or performance of, on behalf of the Company, all other contracts, agreements and other undertakings and the taking of any other action as may be necessary or advisable in the judgment of the Manager or incident to carrying out in the business of the Company.

Any contract, agreement, instrument or other document to which the Company is a party may be signed by either one of the Managers.

Without limiting the generality of the foregoing and by way of example, each of Ronald Buchholz and Charice Buchholz, acting alone, have the right, power and authority to open Company bank accounts, sign Company checks, acquire, mortgage and/or otherwise encumber property of the Company, including approving and signing documentation for the initial loan to acquire the property.

5.5    Restrictions on Authority of the Manager. The Manager shall not have the authority to, and covenants and agrees that he shall not, do any of the following acts without the unanimous consent of the Members:

(a)    cause or permit the Company to engage in any activity that is not consistent with the purposes of the Company as set forth in Section 3.1 hereof;

(b)    knowingly do any act in contravention of this Agreement;

(c)    knowingly do any act which would make it impossible to carry on the ordinary business of the Company, except as otherwise provided in this Agreement;

(d)    cause a significant change in the nature of the Company's business; and,

(e)    cause the Company to admit any additional Members other than pursuant to Article 11 hereof.

5.6    Liability for Certain Acts. The Manager shall perform his duties as Manager in good faith, in a manner he reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. A Manager who so performs the duties as Manager shall not have any liability by reason of being or having been a Manager of the Company. The Manager does not, in any way, guarantee the return of, or on, any Capital Contributions or a profit for the Members from the operations of the Company. The Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, gross negligence or willful misconduct. Nothing in this agreement shall be construed to remove the Manager's fiduciary obligations to the Company Members.

5.7    Manager and Members Have No Exclusive Duty to Company. The Manager shall not be required to manage the Company as his sole and exclusive function and he (and any other Member) may have other business interests and may engage in other activities in addition to those relating to the Company. Neither the Company nor any Member shall have any right, by virtue of this Agreement to share or participate in such other investments or activities of the Manager or any Member or to the income or proceeds derived therefrom. Neither the Manager nor any Member shall incur any liability to the Company or to any of the Members as a result of engaging in any other business or venture. However,

7

the Managers must devote such time to the Company as needed to protect the interests of the Company and the furtherance of its operations.

     5.8    Bank Accounts. Each Manager may, from time to time, open bank accounts in the name of the Company.

     5.9    Indemnification. The Company shall indemnify and hold harmless the Manager and make advances for expenses to the maximum extent permitted under Section 7-80-410 of the Colorado Act. The Company shall indemnify and hold harmless its agents who are not the Manager to the fullest extent permitted by law, provided that such indemnification in any given situation is approved by the Manager.

     5.10    Resignation. The Manager of the Company may resign, at any time, by giving written notice to the Members of the Company. The resignation of a Manager shall take effect upon the giving of such notice thereof or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. The resignation of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal as a Member. Neither Ron Buchholz nor Charice Buchholz may resign as Manager without the unanimous written consent of the Members.

     5.11    Removal; Vacancies. A Manager may be removed at any time by the affirmative vote of all of the Members or upon a determination of Incompetence of a Manager as set forth in Section 5.3.. The Manager elected to fill a vacancy shall hold office until the earlier of his death, resignation or removal or a determination of Incompetence of a Manager.

     5.12    Reimbursements and Salaries. Each Manager and Member shall be reimbursed for his reasonable out-of-pocket costs that are incurred in furtherance of Company business and evidenced by appropriate documentation. Except as otherwise provided in Section 5.14 below, or in the project budget, from time to time approved by the Members, no Member or Manager shall be paid any fees, salaries or compensation in connection with any services performed for, or on behalf of, the Company.

     5.13    Right to Rely on the Manager. Any Person dealing with the Company may rely (without duty of further inquiry) upon a certificate signed by one (1) Manager as to:

     (a)    the identity of the Manager or any Member;

     (b)    the existence or nonexistence of any fact or facts which constitute a condition precedent to acts by the Manager or which are in any other manner germane to the affairs of the Company;

     (c)    the Persons who are authorized to execute and deliver any instrument or document of the Company; or

     (d)    any act or failure to act by the Company or any other matter whatsoever involving the Company or any Member.

     5.14    Contracts with Affiliates. The Company has or will enter into certain contracts with Meridian, an affiliate of one or both of the Managers. Meridian will be paid a development fee of $600,000.00 and other fees that are set forth in the approved project budget, including without limitation a $250,000.00 construction management fee. The Development Fee will be payable as follows: 25% upon completion of the project submittal package, including conceptual architectural and engineering designs; 25% upon issuance of grading permits; 25% upon the start of vertical construction; 10% upon receipt of

Certificates of Substantial Completion and the remaining 5% upon receipt of Certificates of Occupancy. The Construction Management Fee shall be payable as follows: 25% upon the issuance of grading permits and the remaining 75% shall be payable in equal monthly installments over the next eight (8) months.

## ARTICLE 6 -- RIGHTS AND OBLIGATIONS OF MEMBERS

6.1    <u>Limitation of Liability</u>.  Each Member's liability shall be limited as set forth in this Agreement, the Colorado Act and other applicable law.

6.2    <u>Company Debt Liability</u>.  A Member shall not be personally liable for any debts or losses of the Company beyond such Member's Capital Contributions.

6.3    <u>Company Books</u>.  In accordance with Section 9.15 of this Agreement, the Manager or any Person designated by the Manager shall maintain and preserve, during the term of the Company, and for five (5) years after dissolution, all accounts, books, and other relevant Company documents.  Upon reasonable request and reasonable notice, each Member shall have the right, during ordinary business hours, to inspect and copy such Company documents at the requesting Member's expense.

6.4    <u>Priority and Return of Capital</u>.  Except as expressly provided herein, no Member shall have priority over any other Member, either as to the return of or on Capital Contributions or as to Profits, Losses or distributions; provided that this Section shall not apply to loans (as distinguished from Capital Contributions) which a Member has made to the Company.

6.5    <u>Liability of the Company With Respect to Distributions</u>.

(a)    A Member who rightfully receives the return in whole or in part of his Capital Contribution (as defined in Section 7-80-607 of the Colorado Act) is nevertheless liable to the Company only to the extent now or hereafter provided by the Colorado Act.

(b)    A Member who receives a distribution made by the Company:

(i)    which is either in violation of this Agreement, or

(ii)    when the Company's liabilities exceed its assets (after giving effect to the distribution),

is liable to the Company for a period of six (6) years after such distribution for the amount of the distribution.

6.6    <u>Defaulting Member</u>.  If any Event of Default shall occur with respect to a Member (the "Defaulting Member"), the Company shall have the following remedy available to it in addition to all other rights and remedies provided herein or otherwise available at law or in equity.  The Company shall retain, without interest, all funds which would otherwise be distributed to the Defaulting Member, until such time as the Company recovers the full amount in default, together with any accrued interest, any damages resulting from the default, and any costs incurred by the non-defaulting Members and the Company as a result of such Event of Default including, without limitation, attorney's and accountant's fees.  The amounts retained shall be credited first to such interest, damages and costs, then to the delinquent capital contributions receivable.  The interest shall accrue at the Interest Rate as of the date of delinquency and shall continue to accrue through and until the date of repayment in full and shall be compounded on an annual basis.

6.7    <u>No Voting Rights During Default</u>.  During any time that a Member is a Defaulting Member, such Defaulting Member shall not be entitled to vote on any Company matters, and unless and

9

until such Event of Default is fully cured within any applicable cure period, all actions and decisions of the Company shall be taken by the non-defaulting Members.

## ARTICLE 7 -- MEETINGS OF MEMBERS

7.1    <u>Meetings</u>.  Meetings of the Members, annual, regular, and/or special, shall be held on such date and at such time and place as a Majority Interest shall determine or a Manager shall request. Failure to hold meetings shall not have any adverse effect on the Company, its existence or its operations.

7.2    <u>Notice of Meetings</u>.  Written notice stating the place, day and time of any meeting and the purpose or purposes for which the meeting is called shall be delivered not less than one (1) nor more than thirty (30) calendar days before the date of the meeting.  If three (3) successive letters mailed to the last-known address of any Member are returned as undeliverable, no further notices to such Member shall be necessary until another address for such Member is made known to the Company.

7.3    <u>Meeting of all Members</u>.  If all of the Members shall meet at any time and place, either within or outside of the State of Colorado, and consent to the holding of a meeting at such time and place, such meeting shall be valid without call or notice, and at such meeting lawful action may be taken.

7.4    <u>Record Date</u>.  For the purpose of determining Members entitled to notice of, or to vote at, any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any distribution, or in order to make a determination of Members for any other purpose, the date on which notice of the meeting is delivered (as prescribed above) shall be the record date for such determination of Members.  When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Section, such determination shall apply to any adjournment thereof.

7.5    <u>Quorum</u>.  Members holding more than fifty-one percent (51%) of all Voting Interests, represented in person or by proxy, shall constitute a quorum at any meeting of Members.  The Members present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal during such meeting of that number of Voting Interests whose absence would cause less than a quorum.

7.6    <u>Manner of Acting</u>.

(a)    If a quorum is present, the affirmative vote of Members holding a Majority Interest shall be the act of all of the Members, unless the vote of a greater or lesser proportion or number is otherwise required by the Colorado Act or this Agreement.

(b)    If the Members are unable to secure the affirmative vote of Members holding a Majority Interest (and a quorum is present and the vote of a greater or lesser proportion or number is not otherwise required), the disputed matter shall be submitted to mediation in accordance with the commercial mediation rules of the AAA.  Unless otherwise required by state law, mediation shall be conducted in the City and County of Denver, Colorado by a single mediator to be determined by the Members.  In the event the Members are unable to agree upon a single mediator, each Manager shall select a mediator and the two chosen mediators shall then appoint a third mediator.  A Manager may elect to mediate by sending written notice to the other Member(s), invoking the provisions of this Section. Each Member shall bear their own attorney=s fees and to the extent applicable, and the cost of the mediator each has selected, if applicable.  Otherwise, the cost of mediation shall be borne equally by the Members, including, without limitation, the cost of the third mediator (if any).

(c)    If, upon mediation, the Members are unable or unwilling to secure the affirmative vote of Members holding a Majority Interest, the matter shall be submitted to binding arbitration in

accordance with the commercial arbitration rules of the AAA. Unless otherwise required by state law, arbitration shall be conducted in the City and County of Denver, Colorado by a single arbitrator to be determined by the Members. In the event the Members are unable to agree upon a single arbitrator, each Manager shall select an arbitrator and the two chosen arbitrators shall then appoint a third arbitrator. The three selected arbitrators shall render a decision with respect to the disputed matter. A Member may elect to arbitrate by sending written notice to the other Member(s) no later than ten (10) days after the conclusion of the mediation described above, invoking the binding arbitration provisions of this Section. Each Member shall bear its own attorney=s fees and to the extent applicable, the cost of the arbitrator it has selected. Otherwise, the cost of arbitration shall be borne equally by the Members, including, without limitation, the cost of the third arbitrator (if any). To the extent practicable, the Members shall cause the arbitration to occur in an expeditious fashion.

7.7   Proxies. At all meetings of Members, a Member may vote in person or by proxy executed in writing by the Member or by a duly authorized attorney in fact. Such proxy shall be filed with the Manager of the Company before or at the time of the meeting. No proxy shall be valid after eleven months from the date of its execution, unless otherwise provided in the proxy.

7.8   Action by Members Without a Meeting. Action required or permitted to be taken at a meeting of Members may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, signed by each Member entitled to vote and delivered to the Manager of the Company for filing with the Company records. Action taken under this Section 7.11 is effective when all Members entitled to vote have signed the consent, unless the consent specifies a different effective date. The record date for determining Members entitled to take action without a meeting shall be the date the first Member signs a written consent.

7.9   Waiver of Notice. When any notice is required to be given to any Member by law, this Agreement or otherwise, a waiver thereof in writing signed by the Person entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice. By attending a meeting, a Member: (a) waives objection to lack of notice or defective notice of such meeting unless the Member, at the beginning of the meeting, objects to the holding of the meeting or the transacting of business at the meeting; (b) waives objection to consideration at such meeting of a particular matter not within the purpose or purposes described in the meeting notice unless the Member objects to considering the matter when it is presented.

## ARTICLE 8 -- CONTRIBUTIONS TO THE COMPANY; CAPITAL ACCOUNTS; LOANS

8.1   Members' Capital Contributions. Prior to the Company's acquisition of the Property, each of the Members will make an initial Capital Contribution as set forth on Schedule 8.1.

8.2   Additional Contributions. The Members, upon the affirmative vote of a Majority Interest, shall determine whether it is necessary to make an additional Capital Contribution to the Company, the aggregate amount of such additional Capital Contribution, the deadline by which each Member shall deliver its additional Capital Contribution to the Company and the penalty for failing to strictly comply herewith. Assuming that a Majority Interest has made the requisite determination and in accordance therewith, each Member will make an additional Capital Contribution as determined by the Managers.

8.3   Capital Accounts.

(a)   A separate Capital Account shall be established and maintained for each Member. Each Member's Capital Account shall be increased by (1) the amount of any Capital Contributions to the Company by the Member, and (2) allocations to the Member of Profits and any

income or gain specially allocated to the Member pursuant to Sections 9.2, 9.3 or 9.4. Each Member's Capital Account shall be decreased by (1) the amount of money distributed to the Member by the Company, (2) the fair market value of any property distributed to the Member by the Company, net of any encumbrances upon such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code, and (3) allocations to the Member of Losses and any losses or items of Company expense and deduction specially allocated to the Member pursuant to Sections 9.2, 9.3 or 9.4.

      (b)     In the event of a permitted sale or exchange of all or any portion of a Membership Interest in the Company, the Capital Account of the Transferring Member shall become the Capital Account of the Transferee to the extent it relates to the transferred Membership Interest in accordance with Section 1.704-1(b)(2)(iv) of the Treasury Regulations. Each item of Company income, gain, loss, deduction and credit attributable to a transferred Membership Interest or other change in a Membership Interest to which Code Section 706(d) is applicable, shall, for federal income tax purposes, be determined by and allocated to the Members in such manner as they deem appropriate in accordance with Code Section 706 and the Treasury Regulations thereunder.

      (c)     The manner in which Capital Accounts are to be maintained pursuant to this Section 8.3 is intended to comply with the requirements of Section 704(b) of the Code and the Treasury Regulations promulgated thereunder. If in the opinion of the Members the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Section 8.3 should be modified in order to comply with Section 704(b) of the Code and the Treasury Regulations thereunder, then notwithstanding anything to the contrary contained in the preceding provisions of this Section 8.3, the method in which Capital Accounts are maintained shall be so modified; provided, however, that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement among the Members.

      (d)     Subject to Sections 8.1 and 8.2, no Member shall have any liability to restore all or any portion of a Deficit Capital Account.

    8.4     <u>Withdrawal or Reduction of Capital Contributions.</u>

      (a)     A Member shall not receive out of the Company's property any part of his or its Capital Contribution until all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, have been paid or there remains property of the Company sufficient to pay them.

      (b)     A Member, irrespective of the nature of his or its Capital Contribution, has only the right to demand and receive cash in return for such Capital Contribution.

    8.5     <u>Loans to Finance On-Going Operations.</u>

      (a)     If, at any time, the Company does not have sufficient capital to finance its on-going operations, the Members, upon the affirmative vote of a Majority Interest, may permit the Members to loan monies to the Company. (Such an affirmative determination will not compel a Member to make a loan to the Company; it only means that a Member may loan monies to the Company.) The aggregate outstanding amount of all loans made by a Lender Member to the Company, at any time, shall not exceed $200,000.

      (b)     At no time shall any loan made by a Lender Member to the Company pursuant to this Section 8.5 constitute a Capital Contribution or be treated as such.

      (c)     For each loan made by a Lender Member pursuant to this Section 8.5, the Company shall execute and deliver to that Lender Member a promissory note in its favor and in a form

reasonably satisfactory to it. Each loan made by a Lender Member shall be secured by collateral that is similar in kind, nature and value to collateral that the Company would take when making a loan to a third party in an arms length transaction. The Company shall provide each Lender Member with a grant of security interest in a form reasonably satisfactory to it. The Company, at its sole cost and expense, shall perfect each and every security interest securing a loan made hereunder. All loans shall be re-paid to the Lender Member pursuant to Section 9.6(a) and shall accrue interest at the Interest Rate.

### ARTICLE 9 -- ALLOCATIONS, DISTRIBUTIONS, ELECTIONS AND REPORTS

9.1     <u>Allocations of Profits and Losses</u>.  Subject to Sections 9.2, 9.3 and 9.4, below, the Profits and Losses of the Company shall be allocated as follows:

(a)     *Losses*.  All Losses shall be allocated to the Members Pro Rata.

(b)     *Profits*.  All Profits shall be allocated to the Members Pro Rata.

9.2     <u>Special Allocations</u>.  Notwithstanding Section 9.1 hereof:

(a)     Notwithstanding any other provision of this Section 9.2, if there is a net decrease in the Company's minimum gain as defined in Treasury Regulation Section 1.704 2(d) during a taxable year of the Company, then, the Capital Accounts of each Member shall be allocated items of income (including gross income) and gain for such year (and if necessary for subsequent years) equal to that Member's share of the net decrease in Company minimum gain.  This Section 9.2(a) is intended to comply with the minimum gain chargeback requirement of Section 1.704-2 of the Treasury Regulations and shall be interpreted consistently therewith.

(b)     Items of Company loss, deduction and expenditures described in Section 705(a)(2)(B) which are attributable to any nonrecourse debt of the Company and are characterized as partner (Member) nonrecourse deductions under Section 1.704-2(i) of the Treasury Regulations shall be allocated to the Members in accordance with said Section 1.704-2(i) of the Treasury Regulations.

(c)     Beginning in the first taxable year in which there are allocations of "nonrecourse deductions" (as described in Section 1.704-2(b) of the Treasury Regulations) such deductions shall be allocated to the Members in the same manner as Profit or Loss is allocated for such period.

(d)     All recapture of income tax deductions resulting from sale or disposition of Company property shall be allocated to the Members to whom the deduction that gave rise to such recapture was allocated hereunder to the extent that such Person is allocated any gain from the sale or other disposition of such property.

9.3     <u>Qualified Income Offset</u>.

(a)     No allocations of loss, deduction or Code Section 705(a)(2)(B) expenditures shall be made to any Member if such allocation would cause or increase a Deficit Capital Account of such Member.  The amount of the loss, deduction and/or Code Section 705(a)(2)(B) expenditure which would have caused or increased a Deficit Capital Account of such Member instead shall be allocated to Members with positive Capital Accounts.

(b)     If any Member unexpectedly receives any adjustments, allocations, or distributions described in Sections 1.704-1(b)(2)(ii)(d)(4), (5), or (6) of the Treasury Regulations, which cause or increase a Deficit Capital Account of such Member, or if any Member otherwise would have a Deficit Capital Account at the end of any Company taxable year, then items of Company income and gain

13

(consisting of a Pro Rata portion of each item of Company income, including gross income, and gain for such year and, if necessary, for subsequent years) shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Deficit Capital Account so created or increased as quickly as possible.

(c)    It is the intent that Sections 9.3(a) and (b) be interpreted to comply with the alternate test for economic effect set forth in Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations.

9.4    Curative Allocations.  Any allocations to the Members pursuant to Sections 9.2 and/or 9.3 above shall be taken into account in computing subsequent allocations of Profits and Losses pursuant to Section 9.1, so that the net amount of any items allocated to each Member pursuant to Sections 9.1, 9.2 and 9.3 shall, to the extent possible, be equal to the net amount that would have been allocated to each Member pursuant to the provisions of this Article 9 if the special allocations required by Sections 9.2 and/or 9.3 had not occurred.

9.5    Income Tax Allocations.

(a)    Each item of income, gain, loss or deduction of the Company for federal income tax purposes shall be allocated to the Members in the same manner as the corresponding "book" items are allocated pursuant to Section 9.1.  Credits shall be allocated in accordance with the allocation of the deduction for the Company expenditure which gave rise to the credit.

(b)    In accordance with Section 704(c)(1)(A) of the Code and Section 1.704-1(b)(2)(i)(iv) of the Treasury Regulations, if a Member contributes property with a fair market value that differs from its adjusted basis at the time of contribution, income, gain, loss and deductions with respect to the property shall, solely for federal income tax purposes (and not for Capital Account purposes), be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company and its fair market value at the time of contribution.

(c)    Pursuant to Section 704(c)(1)(B) of the Code, if any contributed property is distributed by the Company other than to the contributing Member within five years of being contributed, then, except as provided in Section 704(c)(2) of the Code, the contributing Member shall, solely for federal income tax purposes (and not for Capital Account purposes), be treated as recognizing gain or loss from the sale of such property in an amount equal to the gain or loss that would have been allocated to such Member under Section 704(c)(1)(A) of the Code if the property had been sold at its fair market value at the time of the distribution.

(d)    If, under Section 1.704 1(b)(2)(iv)(f) of the Treasury Regulations, Company property that has been revalued is properly reflected in the Capital Accounts and on the books of the Company at a book value that differs from the adjusted tax basis of such property, then depreciation, depletion, amortization, and gain or loss with respect to such property shall be shared among the Members in a manner that takes account of the variation between the adjusted tax basis of such property and its book value, in the same manner as variations between the adjusted tax basis and fair market value of property contributed to the Company are taken into account in determining the Members' shares of tax items under Code Section 704(c).

9.6    Distributions.

(a)    Distributable Cash shall be distributed as follows:

(i)    First, to a Lender Member to the extent the Company has not re-paid it for loans made pursuant to Section 8.5;

      (ii)      Second, to Atocha until its initial Capital Contribution is repaid; and,

      (iii)      Thereafter, to the Members Pro Rata.

      (b)      All distributions pursuant to Section 9.6(a) shall be made by the Company at such times as the Manager shall determine and in accordance with prudent fiscal practice.

      (c)      All amounts withheld pursuant to the Code or any provisions of state or local tax law with respect to any payment or distribution to the Members from the Company shall be treated as amounts distributed to the relevant Members pursuant to this Section 9.6.

9.7      <u>Distributions in Kind</u>.  Distributions in kind may be made at such times and in such manner as determined by the Manager.  If any assets of the Company are to be distributed in kind, the gross fair market value of such assets as of the date of distribution shall be determined by independent appraisal or as otherwise agreed by the Members, and the Members' Capital Accounts shall be adjusted in the same manner and proportions as if the assets had been sold for such fair market value and any Profit or Loss had been allocated to the Members in accordance with this Article 9.

9.8      <u>Limitations Upon Distributions</u>.

      (a)      No distribution shall be declared and paid unless, after the distribution is made, the assets of the Company are in excess of all liabilities of the Company, except liabilities to Members on account of their Capital Contributions.

      (b)      Notwithstanding anything to the contrary in this Agreement, proceeds resulting from any sale or other taxable disposition of any property of the Company incident to the liquidation and winding up of the Company, as well as any other property distributed in liquidation of the Company, shall be distributed to the Members in accordance with Section 12.3.

9.9      <u>Accounting Principles</u>.  The Profits and Losses of the Company shall be determined in accordance with reasonable accounting principles applied on a consistent basis using the cash method of accounting.

9.10      <u>Interest On and Return of Capital Contributions</u>.  Except as specifically provided for herein, no Member shall be entitled to interest on its Capital Contribution or to return of its Capital Contribution.

9.11      <u>Accounting Period</u>.  The Company's accounting period shall be the calendar year.

9.12      <u>Records, Audits and Reports</u>.  At the expense of the Company and in accordance with this Agreement, including, without limitation, Section 9.15 below, the Company shall keep records and accounts of all of its operations and expenditures.  At a minimum, the Company shall keep at its principal place of business the following records:

      (a)      a current list of the full name and last known business, residence, or mailing address of each Member, both past and present;

      (b)      a copy of the Articles of Organization of the Company and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed;

      (c)      copies of the Company's federal, state, and local income tax returns and reports, if any, for the four most recent years;

(d)    copies of the Company's then effective Agreement, copies of any writings permitted or required with respect to a Member's obligation to contribute cash, property or services, and copies of any financial statements of the Company for the three most recent years, including all those referred to in Section 9.15 below; and

(e)    any writings evidencing the affirmative vote or consent of the Members for actions taken by the Members or concerning Company affairs, and copies of final agendas and minutes for all Members' meetings.

9.13    <u>Returns and Other Elections</u>.  The TMM (as defined in Section 9.14 below) shall cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business.  Copies of such returns, or pertinent information therefrom, shall be furnished to the Members within a reasonable time after the end of the Company's Fiscal Year, and at any other time upon reasonable request.  For Colorado tax purposes, each Member who is a nonresident of Colorado shall execute and deliver to the Company a Form DR 0107- COLORADO LIMITED LIABILITY COMPANY NONRESIDENT MEMBER INCOME TAX AGREEMENT (the "Nonresident Tax Agreement") no later than sixty (60) calendar days after becoming a Member, as the case may be.

All elections permitted to be made by the Company under federal or state tax laws shall be made as determined by the Manager.

9.14    <u>Tax Matters Member</u>.  Charice Buchholz, an individual, is hereby designated the Tax Matters Member ("TMM") as contemplated by Section 6231(a)(7) of the Code.

9.15    <u>Financial Statements and Reports</u>.  The Manager or any Person designated by the Manager shall cause the preparation and distribution to each Member of the reports described below on the activities and financial position of the Company.  Within sixty (60) calendar days after the end of each fiscal year of the Company, (i) a balance sheet as of the end of such fiscal year, (ii) a statement of income or loss for such fiscal year, (iii) a statement of each Member's Capital Account as of the end of such year and (iv) a Form K1.

## ARTICLE 10 -- TRANSFERABILITY

10.1    <u>General</u>.  Except as otherwise provided herein, no Member shall have the right to:

(a)    sell, assign, transfer, exchange or otherwise transfer for consideration, (collectively, "sell" or "sale"), or

(b)    gift, bequeath or otherwise transfer for no consideration, whether or not by operation of law, except in the case of bankruptcy (collectively, "gift")

all or any part of its Membership Interest.  Each Member hereby acknowledges the reasonableness of the restrictions on sale and gift of Membership Interests imposed by this Agreement in view of the Company purposes and the relationship of the Members.  Accordingly, the restrictions on sale and gift contained herein shall be specifically enforceable.  No Member shall pledge or otherwise encumber any of its Membership Interests as security for repayment of a liability.  Any such pledge or hypothecation shall be void and of no force or effect.

16

10.2     Right of First Refusal.

(a)     A Selling Member which desires to sell any or all of its Membership Interest to a third party purchaser ("Purchaser") shall obtain from such a bona fide written offer to purchase. Said bona fide written offer shall contain all material terms including, without limitation, the name and other pertinent identification information concerning the Purchaser, the amount of the Membership Interest to be sold, the purchase price, the payment terms and the closing date. Immediately upon its receipt of the bona fide written offer, the Selling Member shall deliver written notice (the "ROFR Notice") to the Manager stating the Selling Member's intention to sell such interest, and shall furnish the Manager with a complete copy of the aforesaid offer to purchase.

(b)     No later than five (5) calendar days after the receipt of the ROFR Notice, the Manager, in its sole and absolute discretion, shall determine whether it will permit such a sale to occur. The Manager's decision shall be deemed final and irrevocable and may not be appealed. If the Manager rejects the Selling Member's attempt to sell, the Manager shall deliver written notice to the Selling Member, notifying it of the Manager's decision. In such event, the Selling Member may not attempt to sell all or any part of its Membership Interest for at least nine (9) months, commencing as of the date it received the aforesaid notice of rejection from the Manager. The Selling Member shall also notify the Purchaser accordingly. The Selling Member shall timely and promptly provide the Manager with a copy of such notification.

(c)     If the Manager approves the Selling Member's attempt to sell, it shall deliver a copy of the ROFR notice to all of the Members.

(d)     No later than ten (10) calendar days after the Members' receipt of the ROFR notice, the Company, upon the affirmative vote of a Majority Interest, will determine whether it will exercise its right of first refusal. If the Company elects to exercise such right, the Selling Member and the Company shall cause the purchase and sale transaction to occur pursuant to the aforesaid offer to purchase. To the extent necessary or requested by either party, the Selling Member and the Company shall execute a binding agreement that includes, in part, all of the terms contemplated in the ROFR Notice. The Selling Member shall also notify, in writing, the Purchaser that the Selling Member is rejecting the Purchaser's bona fide written offer. The Selling Member shall timely and promptly provide the Manager with a copy of such notification.

(e)     If the Company does not elect to exercise its right of first refusal, the remaining Members, and each of them, shall, on a Pro Rata basis, have the right to purchase all (but not less than all) of the interest proposed to be sold by the Selling Member as stated in the aforesaid offer to purchase.

The ROFR Notice shall afford each Member with sufficient time (as determined by the Manager) in which to notify the Manager of its commitment to buy a Pro Rata share and how much more in excess of its Pro Rata share, if any. Each Member shall exercise each right of first refusal to the extent applicable (as contemplated herein) by delivering written notice to the Selling Member and the Manager, by certified mail, return receipt requested (with postage prepaid), by personal or overnight delivery or by facsimile. Failure to timely elect shall constitute an irrevocable rejection to participate; thereafter, the Manager shall evaluate the elections to ascertain whether sufficient affirmative elections were made to replace the Purchaser. If not, the Manager will re-contact the Members to stimulate additional commitments.

(f)     Notwithstanding the foregoing, all remaining Members who exercise their respective rights of first refusal may purchase such portion(s) of the interest declined by the Rejecting Member(s). In such event, those remaining Member(s) shall allocate among themselves the rejected

17

portion(s) of the interest. Any such sale with respect to the rejected portion(s) shall be on the same terms and conditions as stated in the aforesaid offer to purchase.

(g)     In the event any one or more of the remaining Members delivers written notice to the Selling Member stating its or their, as the case may be, intentions to exercise its or their right(s) of first refusal, the remaining Member or Members (as the case may be) may designate the time, date and place of closing. Notwithstanding, the date of closing shall be no later than that which is provided in the aforesaid offer to purchase.

(h)     In any event, the aggregate exercises of the rights of first refusal must equal the total interest of the Selling Member to be sold; otherwise, such rights are inoperative. The Manager shall notify the Selling Member and Purchaser, as soon as reasonably practicable, of the status of said election.

(i)     Notwithstanding anything to the contrary stated herein, the Manager, in its sole discretion, may change any or all of the deadlines provided hereinabove in order to conform to the schedule contemplated in, and to allow performance under, the aforesaid offer to purchase. If the Manager elects to make any such change, it shall cause such changes to be delivered along with the ROFR notice.

10.3     Gifting of Membership Interest.

(a)     Notwithstanding anything to the contrary stated in Section 10.1, at any time and from time to time, each of the Members (assuming the Member is a natural person) may gift, bequeath or otherwise transfer for no consideration all or any portion of his Membership Interest to a Family Member or Family Members on such terms and conditions that he deems or has deemed necessary or appropriate. Any of the foregoing actions (*i.e.*, gift, bequeath or otherwise transfer for no consideration) may be effectuated by the Member, conservator, attorney-in-fact (with appropriate power and authority) personal or other legal representative or trustee of a trust created by or of which the transferring Member is/was a substantial beneficiary of such living, incompetent or deceased Gifting Member. In the event a Member is any form of entity, any transfers of its Membership Interest for no consideration shall be subject to Section 10.1 hereof. The Members do hereby acknowledge in the event a Member is an entity, the principals of each such Member shall not be subject to Article 10 of this Agreement and may make such transfers of his or her ownership interests in that Entity as permitted in the applicable governing documents (*e.g.*, bylaws, operating agreement, etc.).

(b)     To effectuate a transfer pursuant to this Section 10.3, the Gifting Member shall deliver written notice to the Manager stating the effective date of the transfer, the amount of Membership Interest being transferred and the identity, address and Social Security or Federal Tax I.D. number of the Transferee. In the event that a Gifting Member's conservator, legal or personal representative or trustee is making a transfer, such shall deliver said notice in accordance with the requirements stated in the foregoing sentence along with such document(s) authorizing him or her to make the transfer. Any transfer not expressly evidenced by the appropriate documentation shall be void and of no force or effect. Each non-Gifting Member shall have standing to challenge any transfers purportedly made in accordance herewith. Upon the effective date of the transfer and the satisfaction of the terms and conditions of Section 10.5, the Transferee shall be deemed a Member of the Company for all purposes.

(c)     References to Member or Gifting Member in this Section 10.3 in the singular or as him shall, where the context so requires, be deemed to include the plural or the feminine or neuter reference, as the case may be.

10.4    Miscellaneous Requirements.

(a)    In the event of the sale or gift of all or any portion of a Membership Interest and as a condition to recognizing the effectiveness and binding nature of any such sale or gift, the Manager may require the Selling Member or Gifting Member and the proposed Transferee to execute, acknowledge and deliver to such instruments of transfer, assignment and assumption and such other certificates, representations and documents, and to perform all such other acts which the Manager may deem necessary or desirable to:

(i)    constitute such Transferee as a Member;

(ii)    confirm that the Transferee desiring to acquire an interest in the Company has accepted, assumed and agreed to be subject and bound by all of the terms, obligations and conditions of the Agreement, as the same may have been further amended;

(iii)    preserve the Company after the completion of such sale, transfer, assignment, or substitution under the laws of each jurisdiction in which the Company is qualified, organized or does business;

(iv)    maintain the status of the Company as a partnership for federal tax purposes; and

(v)    assure compliance with any applicable state and federal laws including securities laws and regulations.

(b)    Notwithstanding any provision in the Agreement to the contrary, any transfer of an interest from a Member to an existing Member shall transfer that percentage of the Membership Interest as specified in the appropriate document. In any event of any transfer, duplicate original documents must be delivered to Manager within seven (7) calendar days after stated effective date thereof in order to in fact be effective.

10.5    Specific Enforcement.    Because of the unique relationship of the Members in the Company and the unique value of their Interests, in addition to any other remedies for breach hereof, the provisions of this Agreement concerning purchase and sale of Membership Interests shall be specifically enforceable, among other remedies that may be available.

10.6    Transfer Indemnity.    The Transferring Member hereby indemnifies the Company, the Manager and the remaining Members against any and all loss, damage, or expense (including, without limitation, tax liabilities or loss of tax benefits) arising directly or indirectly as a result of any transfer or purported transfer in violation of this Article 10.

## ARTICLE 11 -- ADDITIONAL MEMBERS

From the date of the formation of the Company, no Person or Entity may become a Member in this Company without the unanimous consent of the Members. No new Members shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Company. At the time a Member is admitted, the Manager, at his option, may close the Company books (as though the Company's tax year had ended) or make pro rata allocations of loss, income and expense deductions to a new Member for that portion of the Company's tax year in which a Member was admitted in accordance with the provisions of Section 706(d) of the Code and the Treasury Regulations promulgated thereunder.

## ARTICLE 12 – DISSOLUTION AND TERMINATION

12.1    <u>Dissolution</u>.

(a)    The Company shall be dissolved upon the occurrence of any of the following events:

(i)    upon the sale of all or substantially all of the Company's assets;

(ii)    by written agreement of the Members; or

(iii)    as otherwise required by applicable law.

(b)    As soon as possible following the occurrence of any of the events specified in Section 12.1(a), the Manager or any person designated by the Manager shall complete and execute duplicate originals of a statement of intent to dissolve in such form as shall be prescribed by the Colorado Secretary of State and shall file duplicate originals of the same with the Colorado Secretary of State's office.

(c)    If a Member, who is an individual, dies or a court of competent jurisdiction adjudges him to be incompetent to manage his person or his property, the Member's executor, administrator, guardian, conservator, or other legal representative (each, "Successor") may exercise the Member's rights for the purpose of settling his estate or administering his property, provided, however, that such Successor shall have no Voting Rights and shall be merely the owner of an Economic Interest.

Notwithstanding anything to the contrary stated herein, so long as a Successor is acting on behalf of any Member as contemplated in this Section 12.1(c), the Company shall not transact any business requiring the vote of the Members or action to be taken by the Managers.

12.2    <u>Effect of Filing of Dissolving Statement</u>. Upon the filing with the Colorado Secretary of State of a statement of intent to dissolve, the Company shall cease to carry on its business, except insofar as may be necessary for the winding up of its business, but its separate existence shall continue until articles of dissolution have been filed by the Colorado Secretary of State or until a decree dissolving the Company has been entered by a court of competent jurisdiction.

12.3    <u>Winding Up, Liquidation and Distribution of Assets</u>.

(a)    Upon dissolution, the Manager, in its sole discretion, may cause an accounting to be made of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the previous accounting (if any) until the date of dissolution. The Manager shall immediately proceed to wind up the affairs of the Company.

(b)    If the Company is dissolved and its affairs are to be wound up, the Manager shall cause the assets of the Company to be distributed as provided in C.R.S. § 7-80-805, as amended from time to time.

(c)    To the extent necessary to satisfy any and all liabilities with third parties, the Manager may sell or otherwise liquidate all of the Company's assets as promptly as possible. Each such sale shall be in an arms-length transaction. To determine the fair market value of an asset to be liquidated, the Manager may select an independent appraiser with sufficient expertise and knowledge. The appraiser will act as promptly as possible and will value the asset as of the date of dissolution. To the extent the Company has the financial wherewithal, it shall pay the cost of the independent appraiser. Should the Company not have sufficient financial wherewithal, the Members will advance the monies

20

necessary to pay the independent appraiser. No Member shall be required to advance more than its Pro Rata share. Those advances shall be deemed loans made pursuant to Section 8.5 hereof.

(d)    If any assets of the Company are to be distributed in kind to a third party or a Member or Members, the net fair market value of such assets shall determined pursuant to subsection (c) above. Each distribution shall be deemed to have occurred on the date of dissolution (notwithstanding the actual date of such distribution). To the extent a distribution in kind is made to a Member, its Capital Account shall be adjusted pursuant to this Agreement including, without limitation, Section 8.3 and Article 9 hereof, to reflect the distribution.

(e)    The positive balance (if any) of each Member's Capital Account (as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs) shall be distributed to the Members, either in cash or in kind, as determined by the Manager, with any assets distributed in kind being valued for this purpose as provided above. Any such distributions to the Members in respect of their Capital Accounts shall be made in accordance with the time requirements set forth in Section 1.704-1(b)(2)(ii)(b)(2) of the Treasury Regulations.

(f)    Notwithstanding anything to the contrary in this Agreement, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a Deficit Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contribution, and the negative balance of such Member's Capital Account shall not be considered a debt owed by such Member to the Company or to any other Person for any purpose whatsoever.

(g)    The Manager shall comply with any applicable requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

12.4    Articles of Dissolution. When all debts, liabilities and obligations have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets have been distributed to the Members, the Manager shall cause the completion and filing of duplicate originals of articles of dissolution in accordance with the Colorado Act.

12.5    Certificate of Dissolution. Upon the filing of articles of dissolution, the existence of the Company shall cease, except for the purpose of suits, other proceedings, and appropriate action as provided in the Colorado Act. The Manager shall thereafter be trustees for the Members and creditors of the dissolved Company and, as such, shall have authority to distribute any Company property discovered after dissolution, convey real estate and take such other action as may be necessary on behalf of, and in the name of, the Company.

12.6    Return of Contribution Nonrecourse to Other Members. Except as provided by law or as expressly provided in this Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of his or its Capital Contribution. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to make a return of, or on, the cash distribution of one or more Members, they shall have no recourse against any other Member, Manager, or the Company, except for gross negligence or willful misconduct.

**ARTICLE 13 -- MISCELLANEOUS PROVISIONS**

13.1    Liability; Indemnification. Each Member shall indemnify the Company, the Manager and the other Members for, and hold them harmless from, any and all liability, loss, damage or expense, including, without limitation, reasonable attorneys' fees, incurred as a result of such Member's breach of

any provision of this Agreement. Notwithstanding any other provision of this Agreement, no Member, agent or employee of a Member shall be liable to any other Member or the Company with respect to any act performed or neglected to be performed in good faith and in a manner which such Person reasonably believed to be necessary or appropriate in connection with the ordinary and proper conduct of the Company's business or the preservation of its property, and consistent with the provisions of this Agreement. The Company shall indemnify and hold harmless all Persons who are or were Members from any liability, whether civil or criminal, and any loss, damage, or expense, including reasonable attorneys' fees, incurred in connection with the ordinary and proper conduct of the Company's business and the preservation of its business and property, or by reason of the fact that such Person is or was a Member; provided the Person to be indemnified acted in good faith and in a manner such Member reasonably believed to be consistent with the provisions of this Agreement; and provided further that with respect to any criminal action or proceeding, the Person to be indemnified had no reasonable cause to believe the conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent shall not of itself create a presumption that indemnification is not available hereunder. The Company may advance actual expenses to Members or other Persons threatened by such claims for the actual cost of defending against such claims, without final determination of the availability of indemnification hereunder. The obligation of the Company to indemnify any Person hereunder shall be satisfied out of Company assets only, and if the assets of the Company are insufficient to satisfy its obligation to indemnify any Person, such Person shall not be entitled to contribution from any other Member.

13.2    Notices. All notices and other communications required or permitted under this Agreement will be made in writing and given in accordance with this Section 13.2. Notices are to be addressed to the Members as provided in Schedule 4 and will be deemed to have been given (a) the day delivered when delivered personally, (b) one (1) business day after having been timely deposited for overnight delivery, fee prepaid, with any reputable overnight courier service with a reliable tracking system, (c) three (3) business days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by certified mail, postage prepaid, return receipt requested, or (d) on being sent by facsimile as of when confirmation of receipt is electronically recorded. The address(es) of any Member may be changed, from time to time, by the giving of notice in accordance with this subparagraph; provided, however, that no change of address will be effective until written notice of such change actually is received by the party to whom such change of address is sent.

13.3    Books of Account and Records. All Company books and records shall be maintained as provided in Section 9.12. The books and records shall be maintained at the Company's principal place of business and shall be open to the reasonable inspection and examination of the Members or their duly authorized representatives during reasonable business hours (*e.g.*, 9:00 a.m. to 5:00 p.m.) on days the Federal government is open for business.

13.4    Application of Colorado Law. This Agreement and the application of interpretation hereof shall be governed exclusively by its terms and by the laws of the State of Colorado, and specifically the Colorado Act.

13.5    Waiver of Action for Partition. Each Member irrevocably waives during the term of the Company any right that it may have to maintain any action for partition with respect to the property of the Company.

13.6    Entireties; Amendments. This Agreement contains at its execution the complete understanding, and supersedes all prior understandings and agreements, whether oral and written, of the parties with respect to the subject matters contained herein. This Agreement may not be amended except by the unanimous written agreement of all of the Members.

22

13.7    Investment Representations.  The Members understand (a) that the Membership Interests evidenced by this Agreement have not been registered under the Securities Act of 1933, the Colorado Securities Act or any other state securities laws (the "Securities Acts") because the Company is issuing these Membership Interests in reliance upon the exemptions from the registrations requirements of the Securities Acts providing for issuance of securities not involving a public offering, (b) that the Company has relied upon the fact that the Membership Interests are to be held by each Member for investment, and (c) that exemption from registrations under the Securities Acts would not be available if the Membership Interests were acquired by a Member with a view to distribution.

Accordingly, each Member hereby confirms to the Company that such Member is acquiring the Membership Interests for such own Member's account, for investment and not with a view to the resale or distribution thereof, except as otherwise contemplated herein.  Each Member agrees not to transfer, sell or offer for sale any of portion of its Membership Interest unless there is an effective registration or other qualification relating thereto under the Securities Acts and under any applicable state securities laws or unless the holder of Membership Interest delivers to the Company an opinion of counsel, satisfactory to the Company, that such registration or other qualification under such Act and applicable state securities laws is not required in connection with such transfer, offer or sale.  Each Member understands that the Company is under no obligation to register the Membership Interest or to assist such Member in complying with any exemption from registration under the Securities Acts if such Member should, at a later date, wish to dispose of the Membership Interest.  Furthermore, each Member realizes that the Membership Interests are unlikely to qualify for disposition under Rule 144 of the Securities Act of 1933.

Prior to acquiring its Membership Interest, each Member has made an investigation of the Company and its business and has examined all information with respect thereto which such Member needed to make an informed decision to acquire the Membership Interest.  Each Member considers himself to be a person possessing experience and sophistication as an investor which are adequate for the evaluation of the merits and risks of such Member's investment in the Membership Interest.  Each Member understands that the purchase of the Membership Interests is risky and capable of losing its entire investment in the Company.  Each Member has consulted his own advisors (tax, legal and financial) and is not relying on any representations or warranties of any person other than those stated in this Agreement.

13.8    Execution of Additional Instruments.  Each Member hereby agrees to execute such other and further statements of interest and holdings, designations, powers of attorney and other documents or instruments as may be necessary to comply with any laws, rules or regulations.

13.9    Waivers.  The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Agreement shall not prevent a subsequent act, that would have originally constituted a violation, from having the effect of an original violation.

13.10    Rights and Remedies Cumulative.  The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any or all other remedies.  Said rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

13.11    Severability.  If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Agreement and the application there of shall not be affected and shall be enforceable to the fullest extent permitted by law.

13.12   Heirs, Successors and Assigns.   Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Agreement, their respective heirs, legal representatives, successors and assigns.

13.13   Creditors.   None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company.

13.14   Counterparts.   This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.   A facsimile signature shall be deemed a valid, original signature and binding.

13.15   Rule Against Perpetuities.   The parties hereto intend that the Rule Against Perpetuities (and any similar rule of law) not be applicable to any provisions of this Agreement.   However, notwithstanding anything to the contrary in this Agreement, if any provision in this Agreement would be invalid or unenforceable because of the Rule Against Perpetuities or any similar rule of law but for this Section 13.15, the parties hereto hereby agree that any future interest which is created pursuant to said provision shall cease if it is not vested within twenty-one years after the death of the survivor of the group composed of the Members identified herein (or if any such Member is not an individual, the chief executive officer of such Member), and their issue, if any, who are living on the Effective Date.

13.16   Further Assurances.   From and after the date of this Agreement, the Members agree to do such things, perform such acts, and make, execute, acknowledge and deliver such documents as may be reasonably necessary or proper and usual to complete the transactions contemplated by this Agreement and to carry out the purposes of this Agreement in accordance with this Agreement.

*(The remainder of this page has been intentionally left blank.)*

## CERTIFICATE

The undersigned hereby agree, acknowledge and certify that the foregoing Operating Agreement constitutes the Operating Agreement of the Company adopted by the Members of the Company as of the Effective Date.

**MEMBERS:**

**ATOCHA LAND, LLC**

By:_____
               Thomas Cirrito, Manager

**RNC HOLDINGS, LLC**

By:_____
               Charice Buchholz, Manager

# EXHIBIT A

## LEGAL DESCRIPTION

Lot 14D
Park Meadows – Filing No. 2 2nd Amendment,
County of Douglas,
State of Colorado

## SCHEDULE 4

### Names and Addresses of initial Members

| Name | Address |
|------|---------|
| Atocha RNC | 20 Great Oaks Boulevard, Suite 230 San Jose, CA   95123 |

## SCHEDULE 8.1

### Members' Capital Contributions

| Name | Contribution |
|------|-------------|
| Atocha | $2,600,000 |
| RNC | -0- |

**EXHIBIT B**

**Lone Tree**

1/24/2006

| | | |
|---|---|---|
| Land Area | | 5.42 acres |
| Land Cost psf of Land Area | | 16.75 |
| Building Area | | 71,000 g.s.f. |
| Coverage | | 0.30 |

**Development Proforma**

| | | | |
|---|---|---|---|
| Land Cost | $ | 3,954,595 | $ 55.70 |
| | | 0 | $ - |
| Total Land Cost | $ | 3,954,595 | $ 55.70 |
| | | | |
| Interest Carry 7.00% | | 459,846 | $ 6.48 |
| Architectural Design | | 275,000 | $ 3.87 |
| Engineering Design | | 60,000 | $ 0.85 |
| Design Review Fees | | 15,000 | $ 0.21 |
| Legal | | 15,000 | $ 0.21 |
| Real Estate Taxes | | 25,000 | $ 0.35 |
| Developer Fee | | 600,000 | $ 8.45 |
| Signage | | 15,000 | $ 0.21 |
| Miscellaneous | | 200,000 | $ 2.82 |
| Contingency | | 125,000 | $ 1.76 |
| Building & Site Cost | | 4,615,000 | $ 65.00 |
| TI for Retail 18600 sqft | | 316,200 | $ 17.00 |
| Site work | | 1,065,000 | $ 15.00 |
| Marketing | | 25,000 | $ 0.35 |
| Site Maintenance | | 7,500 | $ 0.11 |
| Utility Connection Fees | | 100,000 | $ 1.41 |
| Plan Review Fees | | 100,000 | $ 1.41 |

| | | |
|---|---:|---:|
| Permit Fees | 175,000 | $ 2.46 |
| Construction Management Fees | 250,000 | $ 3.52 |
| Insurance | 40,000 | $ 0.56 |
| Construction Finance Fees | 70,000 | $ 0.99 |
| Other Consultants | 75,000 | $ 1.06 |
| Accounting | 50,000 | $ 0.70 |
| Total Construction Cost | $8,678,546 | $ 122.23 |
| | | |
| Total Project Cost | $ 12,633,141 | $ 177.93 |

**Building Sales Analysis**

|                            |              |          |
|----------------------------|-------------:|---------:|
| Office Sales               | $17,040,000  | $ 240.00 |
| Sales Commissions (6%)     | -$1,022,400  | -14.40   |
| Closing Costs (20 Closings)| -$100,000    | -1.41    |
| Net Revenue                | $15,917,600  | $ 224.19 |

**Financing & Investment Analysis**

|                      |          |              |          |
|----------------------|----------|-------------:|---------:|
| Total Loan Amount    |          | $10,106,513  |          |
| Loan to Value        |          | 80%          |          |
| Equity               |          | $ 2,526,628  |          |
| Total Project Profit |          | $3,284,459   | $ 46.26  |
| Total Return         | 130%     |              |          |
| Equity Raised        | 50%      | $2,600,000   |          |
| Investor Profit      |          | $1,642,230   |          |
| Investor ROI         |          | 63.16%       |          |

%JS 44 (Rev. 12/07) (cand rev 1-08)

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

**I. (a) PLAINTIFFS**
THOMAS CIRRITO, ATOCHA LAND LLC

**(b)** County of Residence of First Listed Plaintiff  Santa Clara
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
TODD A. ROBERTS, JESSHILL E. LOVE
ROPERS, MAJESKI, KOHN & BENTLEY
1001 Marshall Street
Redwood City, CA  94063  (650) 364-8200

**DEFENDANTS**
RNC HOLDINGS, INC., ET AL.

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)

ADR

E-filing

C08 03477 PVT

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☐ 3  Federal Question (U.S. Government Not a Party) |
| ☐ 2  U.S. Government Defendant | ☒ 4  Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☒ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 463 Habeas Corpus - Alien Detainee | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Appeal to District Judge from Magistrate Judgment |

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
18 U.S.C. Section 1, et seq.; 17 C.F.R. Section 240.10B-5; 15 U.S.C. Section 771(a)
Brief description of cause:
Investment Ponzi Scheme, Unqualified Sale of Securities

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY**
PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

**IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2) (PLACE AND "X" IN ONE BOX ONLY)**
☐ SAN FRANCISCO/OAKLAND AND  ☒ SAN JOSE

DATE
SIGNATURE OF ATTORNEY OF RECORD

American LegalNet, Inc.
www.FormsWorkflow.com